UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DENISE K. STREATY, | ) |
|     Plaintiff, | ) ) ) |
|     v. | ) CASE NO. 1:10-cv-0523-TWP-MJD ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | ) ) ) ) |
|     Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Denise Streaty ("Streaty"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Streaty's application for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. § 301, *et seq*.

**I. BACKGROUND**

**A.  Procedural History**

Streaty applied for DIB on August 30, 2004, alleging an onset date of February 9, 2004. She alleged disability due to major depressive disorder ("MDD"), bipolar disorder, obsessive compulsive disorder ("OCD"), fibromyalgia, adult respiratory distress syndrome, interstitial cystitis and neuropathy. On April 3, 2008, Administrative Law Judge James R. Norris ("ALJ") found that Streaty was not disabled at any time from the alleged onset date through the date of

the decision. On November 24, 2009, the Appeals Counsel upheld the decision of the ALJ and denied the request for review thus making the ALJ's decision final. 20 C.F.R. § 404.981.[1]

**B.     Factual Background**

Streaty was 43 years old on her alleged onset date of February 9, 2004. R. at 35. She graduated from college with a Bachelor of Science degree. *Id*. at 164. Streaty's past relevant work experience included working as a lab chemist. *Id*.

    **1.     Mental Impairments**

On February 9, 2004, Streaty saw Dr. Perez ("Perez") and complained of severe depression resulting from recent relationship problems, and stated she was unable to relax or concentrate. *Id*. at 645, 653. On February 18, 2004, Perez diagnosed Streaty with major depression, partner relationship problems and possible OCD. *Id*. at 646. On August 2, 2004, Streaty sought treatment for job stress, and stated she was unable to sleep or eat. *Id*. at 407. On August 13, 2004, Streaty underwent a psychiatric consultation with Dr. Deal ("Deal"), who diagnosed her with major depressive disorder and assigned her a GAF of 60 to 65. *Id*. at 752, 754. Deal stated that he could not conclude that her depression was caused by her work problems; however, he opined that the stress at work was exacerbating her depression. *Id*.

On October 6, 2004, Dr. Ball ("Ball") performed an initial psychological evaluation of Streaty. *Id*. at 231. Streaty reported that she feared contamination, felt anxious, cleaned any objects touched by visitors to her house, cleaned for hours daily, washed her hands 30 times daily, and limited contact with objects in her house. *Id*. Ball noted Streaty had experienced residual lack of stamina in terms of shortness of breath and had developed neuropathy in her extremities after being in a drug induced coma for 17 days in 2002 from severe pneumonia. *Id*. at

---

[1] Tragically, on January 24, 2010, Streaty committed suicide.

232. Ball also noted Streaty walked with a noticeable gait alteration due to her neuropathy. *Id*. Ball diagnosed Streaty with OCD and MDD, and assigned her a GAF of 50. *Id*. at 233. Ball recommended that Streaty participate in weekly cognitive-behavioral treatment, and Streaty agreed. *Id*. On October 15, 2004, Streaty arrived to see Ball and used tissues to cover her hands while touching objects and rubbed Vaseline on her hands during the session. *Id*. at 230.

On November 8, 2004, Streaty was voluntarily admitted to inpatient psychiatric service for depression and suicidal ideation. *Id*. at 217. Streaty reported she had a fear of contamination, which resulted in obsessive thoughts of dirtiness. *Id*. She stated if someone visited her home she would spend several hours cleaning any area that person may have been in. *Id*. During this visit, Streaty was diagnosed with MDD, OCD, social anxiety disorder, and assigned a GAF of 25. *Id*. at 219.

On November 18, 2004, Ball completed a questionnaire for Streaty's disability insurance provider and stated Streaty's diagnoses were severe, recurrent MDD and OCD. *Id*. at 224-226. At this time, Streaty was unable to sustain attention and concentration, had impaired decision making and problem-solving skills, fatigue, sleep problems, psychomotor retardation, obsessions related to fear of contamination, and repetitive compulsive behaviors interfering with daily functioning. *Id*.

On January 18, 2005, psychiatrist Lee Becker reviewed Streaty's record at the request of her employer's disability insurer. He opined that records from September 10, 2004 to October 24, 2004 "appear[ed] to support functional limitations precluding occupational functioning during that time," but those from May 13, 2004 to September 9, 2004 did not. *Id*. at 251.

On February 25, 2005, Streaty's former manager completed a questionnaire regarding her employment performance. *Id*. at 482. The questionnaire revealed Streaty exhibited difficulty

with learning new concepts, relating to others in her work area, making routine decisions, maintaining focus on routine activities, and retaining information. Also, Streaty was easily confused when there was varied activity in the immediate vicinity. However, she could still perform simple and repetitive activities, accept instruction and criticism, and get along with others. *Id*. at 482-484.

On March 3, 2005, Dr. Unversaw ("Unversaw") completed a Psychiatric Review Technique Form. *Id* at 564-577. Unversaw reviewed Streaty's impairments under 12.04 Affective Disorders (MDD) and 12.06 Anxiety-Related Disorders for her recurrent obsessions or compulsions. *Id*. at 567, 569. Regarding Streaty's degrees of functional limitation, Unversaw concluded that she had mild degrees of limitation in her restriction of activities of daily living and difficulties in maintaining social functioning, and moderate degrees of limitation in her difficulties maintaining concentration, persistence, or pace. *Id*. at 574. Unversaw also found one or two episodes of decompensation of extended duration. *Id*. On March 11, 2005, Unversaw completed a mental Residual Functional Capacity ("RFC") assessment, finding moderate limitations in Streaty's ability to carry out detailed instructions, maintain extended concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Unversaw also found limitations in Streaty's ability to respond appropriately to changes in the work setting. However, Unversaw found no significant limitations in 15 other enumerated abilities.

Streaty's long term disability insurance provider requested an opinion regarding her condition from Ball in May 2005, and another opinion from Tammy Moroz in August 2005. *Id*. at 295-298, 253-256. The doctors completing the requests concluded that Streaty was unable to

4

complete daily activities without assistance, her repetitive compulsive behaviors and obsessive thoughts interfered with her ability to complete simple routine tasks, and she consistently scored in the range indicating severe depressive symptoms on objective tests administered weekly. She also had difficulty with sustaining attention and concentration, and was observed to have chapped hands, touch objects with tissues, and wash her hands repeatedly during therapy sessions. They also opined that despite aggressive treatment and a 100% compliance rate in therapy and medication management, she continued to experience treatment refractory depression and OCD resulting in an unknown prognosis as to when she could return to work. *Id*.

From July 11, 2005 through July 14, 2005, Streaty was hospitalized for an escalation in her symptoms of anxiety and obsessive thinking with fears of contamination and compulsive behavior. *Id*. at 274. Streaty also reported that she began to feel vaguely suicidal with passive thoughts of wanting to kill herself or overdose on her medications. *Id*.

Throughout 2006, Streaty attended individual therapy sessions with Dr. Morris. *Id*. at 173-215. These sessions focused on dealing with anxiety, emotions, appropriate responses, contamination fears, and her OCD. *Id*. On October 30, 2006, Morris completed an evaluation form regarding Streaty's status. *Id*. at 161. Streaty's diagnoses were OCD, recurrent MDD, dependant personality disorder traits, and a GAF of 41-50. *Id*. Morris stated that Streaty's depression had improved and was stable, but "[her] profound obsessions and compulsions (contamination fears and cleaning rituals) are of a nature that would not allow reasonable accommodations to allow workplace re-entry at present." *Id* at 161-162.

From January 15, 2007 to January 22, 2007, Streaty was hospitalized. *Id*. at 115. Streaty came to the hospital because she told her fiancé she wanted to die. *Id*. at 104. She reported feeling suicidal in the weeks before the hospitalization, and had recently made a plan to commit

5

suicide. *Id*. She also reported having trouble concentrating and completing simple tasks at home. *Id*. She was assessed as having a GAF of 30. *Id.* at 113. Upon discharge on January 22, 2007, Streaty was diagnosed with bipolar affective disorder, depression, history of OCD, personality disorder NOS, and a GAF of 60. *Id*. at 116. Streaty was again hospitalized from January 30, 2007 to February 5, 2007 for similar reasons. *Id*. at 92.

On August 21, 2007, Charles Warfield, M.S.W., L.C.S.W. ("Warfield"), and Dr. Julia Hyland completed a medical statement concerning Streaty's bipolar disorder. *Id*. at 55. They opined that Streaty suffered from symptoms of panic attacks and OCD. *Id*. They also opined that she had a marked restriction of activities of daily living; marked difficulty in maintaining social functioning; deficiencies of concentration, persistence or pace that resulted in frequent failure to perform tasks timely in work settings or elsewhere; and repeated episodes of decompensation. *Id*. at 56. Out of twenty work limitation categories, only two were not selected as markedly or extremely impaired.[2] *Id*. at 56-57. They also opined that Streaty would be absent from work over four days a month due to her impairments or treatment. *Id*. at 58.

On October 3, 2007, Warfield wrote a statement confirming Streaty was in active treatment at a mental health facility being treated for Bipolar I Disorder and OCD. *Id*. at 54. He noted Streaty was receiving group and individual therapy and medication management, and opined that Streaty's symptoms had the potential to be so severe and debilitating that her functioning was markedly impaired, including her ability to work. *Id*. On March 5, 2008, Warfield wrote another statement stating he believed Streaty was misdiagnosed from at least as far back as November 2004, when she had a nervous breakdown and was hospitalized. *Id*. at

---

[2] The two categories were the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and the ability to be aware of normal hazards and take appropriate precautions. R. at 57.

6

438. Warfield opined Streaty had not been emotionally stable enough to work since that breakdown.

On October 16, 2007, Dr. Modlik ("Modlik") performed a psychological evaluation for the Social Security Administration, which included a mental status examination, a personality test, and a test for memory malingering. *Id*. at 824. Modlik observed that Streaty's hands showed no evidence of OCD. *Id*. He also noted that the results of cognitive functioning and memory tests showed malingering, and did not suggest significant cognitive impairments. *Id.* at 827-28. He opined that the results of a personality test were very likely invalid because they also showed signs of malingering. *Id*. at 830. He diagnosed Streaty with malingering of severe psychiatric impairment and cognitive impairment, recurrent, unspecified MDD (probably mild) and OCD.[3] *Id*. at 832.

### 2. **Physical Impairments**

Streaty developed neuropathy after being in a coma for 17 days in 2002 from severe pneumonia. *Id*. at 232. In September 2004, she saw Dr. Nelson ("Nelson") and complained of dysuria (painful or difficult urination) from interstitial (chronic bladder pressure and pain) and musculoskeletal pain. *Id*. at 417. Nelson completed a questionnaire for Streaty's disability carrier in which he opined that she could never climb due to some gait unsteadiness, could occasionally lift up to 20 pounds, and could work a total of four to six hours a day. *Id*. at 435. He also opined that she could intermittently sit for six hours, stand for four hours, and walk for three hours a day. *Id*. Even with this analysis, Nelson stated he did not have enough information to advise Streaty to return to work. *Id*.

---

[3] During the administrative hearing, Dr. Brooks testified that there was no other evidence of malingering in the record. R. at 880. He did, however, note that treating physicians do not normally look for malingering. *Id*.

7

On February 9, 2005, Dr. Bakdash ("Bakdash") examined Streaty and concluded she had peripheral neuropathy with numbness in her feet and interstitial cystitis. *Id*. at 581. On April 30, 2007, Streaty underwent an MRI on her left shoulder, which revealed mild tendinosis and probable tendinitis of the supraspinatus tendon. *Id*. at 143. On May 18, 2007, she received a steroid joint injection from Dr. Nelson in her left shoulder. *Id*. At 148.

C.     **The Administrative Hearing**

    1.     **Medical Expert Testimony**

At the administrative hearing held on March 6, 2008, Dr. Boyce testified he did not see any evidence of a physical impairment that lasted 12 months in the relevant timeframe. *Id*. at 864. When Streaty's counsel was asked by the ALJ if he had any quarrels with this statement, he stated he had no objections. *Id*.

Clinical psychologist Dr. James Brooks ("Brooks") testified regarding Streaty's mental impairments. *Id*. at 865-885. He testified that there was a stark contrast between Modlik's examination of Streaty and the evidence of her past treatment. *Id*. at 886. Brooks opined that Modlik's report was fairly convincing and was more investigative than a treatment type of inquiry. *Id*. at 874. Brooks further opined that based on Modlik's report and absent any cognitive impairment, Streaty could do simple, repetitive tasks. *Id*. at 879. He noted the divergence in evidence made it difficult to determine whether Streaty met a listing. *Id*. at 877-878. When asked by the ALJ if Streaty potentially met a listing, Brooks opined that a fair reading of Streaty's hospital records would reveal that she was severely disabled, and if the existing records are utilized, Streaty would meet a listing. *Id*. at 873, 878. He then testified that Modlik's examination was thorough, but the other diagnosis was from people directly involved in Streaty's treatment. *Id*. at 878. When examined by Streaty's counsel, Brooks testified that it

was absolutely better to treat someone over time in terms of ascertaining an accurate diagnosis and treatment needs, and the person best suited to evaluate a patient is the person who has treated her over time. *Id*. at 879. Brooks then acknowledged that Modlik's examination was not conducted until October 2007, and sometimes people improve. *Id*. at 881. He opined that "when we have [GAF] such as 25… and 30… that certainly would indicate that [an] individual at that point in time is quite impaired." *Id*.

### 2. **Vocational Expert Testimony**

When examined by the ALJ, the Vocational Expert, Ray O. Burger ("VE"), testified that simple and repetitive work required a very good attendance record, and taking more than one or one and a half days off in a month would likely result in a write up, probation, or termination. *Id*. at 892. The VE then testified that, in his experience, a person who could not show up for work on a reliable basis could not sustain employment. *Id*. at 892.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for disability benefits, a claimant must prove that she is unable to engage in any substantial gainful activity by reason of any medially determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1).

In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.  If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant at the first four steps; it then shifts to the Commissioner at the fifth step. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). A court will sustain the ALJ's findings if they are supported by *substantial evidence*. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).

In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Further, the ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, when the ALJ makes a decision he "must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ must also sufficiently explain his assessment of the evidence in order to allow the reviewing court to trace the path of

reasoning. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). If adequate discussion of the issues is not given, the decision will be remanded. *See Brisco*, 425 F.3d at 351; *see also Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001).

### III. DISCUSSION

**A.  The ALJ's Findings**

After considering all the evidence, including the testimony at the hearing, the ALJ determined that "[b]ased on the application for a period of disability and disability insurance benefits filed on August 30, 2004, [Streaty] is not disabled under sections 216(i) and 223(d) of the Social Security Act." R. at 36. In making his ruling, the ALJ made the following findings:

1. The Claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The Claimant has not engaged in substantial gainful activity since February 9, 2004, the alleged onset date (20 CFR §§ 404.1520(b) and 404.1571 *et seq.*).

3. The Claimant has a depressive disorder, a bipolar disorder and an obsessive compulsive disorder (20 CFR § 404.1520(c)).

4. The Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526).

5. The Claimant has the residual functional capacity to perform work at all exertional levels, and the claimant is capable of performing work that is simple and repetitive.

6. The Claimant is unable to perform any past relevant work (20 CFR § 404.1565).

7. The Claimant was born on March 11, 1960 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR § 404.1563).

8. The Claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as framework supports a finding that

the Claimant is not disabled, whether or not the Claimant has transferable job skills.

10. Considering the Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Claimant can perform.[4]

11. The Claimant has not been under a disability, as defined in the Social Security Act, from February 9, 2004, through the date of ALJ's decision (20 CFR § 404.1520(g)).

**B.      Analysis**

Streaty contends that the ALJ erred in two ways: 1) the ALJ failed to articulate his assessment of SSR 96-7p in assessing Streaty's credibility; and 2) the ALJ failed to incorporate Streaty's non-severe impairments into the RFC. Each is addressed in turn below.

1.    **SSR 96-7p Credibility Assessment**

In this case, the ALJ found Streaty had a depressive disorder, a bipolar disorder and an obsessive compulsive disorder, but she was not disabled under sections 216(i) and 223(d) of the Social Security Act. R. at 27, 36. The ALJ also ruled Streaty had the RFC to perform work at all exertional levels, and she was capable of performing work that was simple and repetitive. *Id*. at 32.

When an ALJ makes a credibility ruling, he must adhere to SSR 96-7p. Among other factors, SSR 96-7p requires an ALJ to consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. After considering all the evidence, the ALJ found Streaty was not "a credible witness in her own behalf." R. at 34.

---

[4] The ALJ did not identify any specific jobs that Streaty could perform.

Streaty claims the decision fails to articulate its consideration of the seven factors enumerated in SSR 96-7p, which are:

> 1) The individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individuals functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p further provides that "the reasons for credibility finding must be grounded in the evidence and articulated in the determination or the decision." In addition, "the determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

Streaty claims the ALJ failed to cite the evidence he considered and the weight he gave the evidence specifically relating to the prongs of SSR 96-7p. She states the ALJ failed to discuss her activities of daily living; failed to address elements two and three regarding the location, duration, and frequency of disability symptoms, and factors that precipitate and aggravate the symptoms; failed to mention her medication regimen, or any related side effects; and failed to articulate a specific and reasoned consideration of the final three elements.

The Commissioner responds that the ALJ's decision "as a whole" reflects that he considered the credibility factors listed in SSR 96-7p. The Commissioner states that the ALJ considered many factors, such as: Streaty's subjective statements, the record physicians' diagnoses and opinions, the objective medical evidence, the mild diagnostic results pertaining to

13

Streaty's physical impairments, the inconsistencies in her statements and suggestions of malingering during her examination with Modlik, her treatment history, including her in-patient mental health treatment, her work history, her EEOC suit against her former employer, her testimony that her medication was taking care of her neuropathy, her reports of significant stress from her failed marriage and returning to her previous work, and her activities of daily living.

Streaty's argument that there was no discussion of daily living is erroneous. The ALJ indeed discussed several factors concerning her daily activities, including the time and energy she spent cleaning her house and washing her hands, who did the cooking in her house, where she went out to eat, personal hygiene management, management of household tasks, leisure activities, and paying bills. R. at 30-31. However, Streaty correctly argues that her ability to do these activities does not necessarily translate into her ability to engage in substantial gainful employment. *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

Overall, the Court is persuaded by Streaty's arguments regarding the remaining subjective factors. The second of the seven factors listed in SSR 96-7p requires the ALJ to consider the location, duration, frequency, and intensity of the individual's pain or other symptoms. The ALJ stated several facts about the symptoms Streaty reported to her doctors, including her anxious feelings when leaving home, excessive cleaning after a guest left her home, contamination fears, hand washing, and limited contact with objects in her home. R. at 29. However, the ALJ failed to give adequate reasons why these statements and other medical evidence in the record were given no weight. The ALJ also mentioned facts about daily activities, but he did not explain how these activities were weighed in the credibility assessment. The ALJ's only other articulated reasoning was "with respect to these allegations they are given little credit since they are not sufficiently reasonably consistent with the overall evidence of the

record to give them any substantial credit as actual limitations for the claimant...." *Id*. at 34. The ALJ simply stated in a conclusory manner that Streaty's statements are not consistent with the record.

However, the record is replete with evidence regarding her severe mental problems. For example, in November of 2004, Streaty was admitted to in-patient psychiatric service for depression and suicidal ideation. R. at 217. There, she was diagnosed with MDD, OCD, social anxiety disorder, and assigned a GAF of *25*. *Id*. She was also hospitalized for seven days in January 2007 because she told her fiancé she wanted to die, and had recently made a plan to commit suicide. *Id*. at 104. Upon arrival she was given a GAF of 30, and diagnosed with bipolar affective disorder, depression, history of OCD, and personality disorder NOS. *Id*. at 113, 116. The initial assessment also revealed she showed the potential to harm herself. *Id*. at 108.[5] These are only a few examples in a medical record littered with evidence of a mental disorder, all of which cannot be explained away with a conclusory assertion that her statements "are not sufficiently reasonably consistent with the record." SSR 96-7p requires that the reasons be sufficiently specific to "make clear" to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. The ALJ's statements are not sufficiently specific, nor do they make clear, the reasons for the lack of "substantial credit" given. As mentioned earlier, an ALJ must explain his assessment of the evidence in order to allow the reviewing court to trace the path of reasoning. *Rohan,* 98 F.3d at 971. Simply stated, the Court needs more from the ALJ to build a logical bridge from the evidence to his conclusion. *See, e.g., Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).

The ALJ barely mentions evidence regarding the fourth factor of SSR 96-7p (type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to

---

[5] ALJ briefly mentioned this hospital visit, but only discussed therapy and a medication adjustment.

alleviate pain or other symptoms). The ALJ briefly stated Streaty experienced relief after taking Prozac and Remeron in 2004. R. at 30. He also mentions a few adjustments doctors made to her medications. *Id*. at 29-30. But the ALJ failed to mention the side effects of Streaty's medications. Streaty complained of sleep problems, excessive nocturnal sweating, and constipation. *Id*. at 295. Testimony at the hearing revealed that one of her medications was very sedating and caused her to need a two to three hour nap every afternoon. *Id*. at 891. Other side effects included short-term memory problems, irritability, agitation, and chronic low grade headache. *Id*. at 253. The Commissioner acknowledges that the ALJ failed to discuss the medications, but argues it was justified because the ALJ adopted the opinions of Dr. Unversaw and Dr. Brooks. The Court is not persuaded. While it is true that the ALJ adopted these medical opinions, SSR 96-7p clearly provides that the reasons for the credibility finding must be grounded in the evidence and *articulated* in the determination or decision. Consequently, the adoption of the medical opinion alone, does not, under these circumstances, offset the ALJ's failure to articulate. The Court recognizes that the ALJ need not evaluate in writing every piece of evidence. *Carlson,* 999 F.2d at 181. However, the ALJ must confront evidence that does not support his conclusion and explain his reasons for rejecting that evidence. *Kasarsky,* 335 F.3d at 543.

There are other problems with the ALJ's decision. The ALJ found that in February 2004, Dr. Perez suggested Streaty had a dysthymic disorder. R. at 28. However, a close look at the record shows on February 18, 2004, Dr. Perez diagnosed Streaty with recurrent major depression, partner relationship problems, and possible OCD. R. at 646. In evaluating Dr. Morris' evaluation of Streaty, the ALJ briefly mentioned medication management in 2004; however, Dr. Morris also treated Streaty extensively in 2006. *Id*. at 29, 173-215. With respect to

16

this treatment, the ALJ only stated, "[i]n October of 2006, Dr. Morris assessed the claimant's depression as improved and currently stable." *Id.* at 30. The very next sentence of Dr. Morris' report, however, reads "her core OCD symptoms remain very impairing." *Id.* at 161. The report further reads "[Streaty] is functionally limited, and [her] profound obsessions and compulsions are of a nature that would not allow reasonable accommodations to allow workplace re-entry." *Id.* at 161-162.

Additionally, the record shows in 2006 Streaty saw Morris 43 times and each time she was diagnosed with recurrent MDD and OCD. *Id.* at 173-215. The ALJ failed to mention or discuss any information from these visits and instead quoted only a single sentence from a single report. A written evaluation of each piece of evidence or testimony is not required, *Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985); however, the ALJ may not select and discuss only that evidence that favors his ultimate conclusion. *Id*. The ALJ's decision must be based upon consideration of all the relevant evidence, and he must articulate at some minimal level his analysis of the evidence. *Id*. The ALJ may have completely rejected the reports from Dr. Morris. Or, the ALJ may have accepted the reports but still found Streaty was not disabled. Unfortunately, there was no discussion of the evidence and the Court cannot guess or assume which route the ALJ took. *See, e.g., Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (reviewing court should not be "left to wonder" how ALJ reached a conclusion). For approximately 43 straight weeks Streaty was treated and diagnosed with MDD and OCD, and only one sentence was taken from this line of evidence. The ALJ made no attempt to clarify why the evidence in the record favoring Streaty (e.g. hospitalization for considering suicide) was outweighed by the evidence on which he relied. Consequently, the Court cannot accept this as

an adequate discussion of the evidence; therefore, the decision must be remanded. *Brisco*, 425 F.3d at 351.

2. **ALJ's Incorporation of Streaty's Non-Severe Impairments into the RFC**

Streaty's next argument is that the ALJ failed to incorporate her non-severe impairments into the RFC. Streaty argues the ALJ refused to allow her to testify regarding her physical impairments, and failed to consider the aggregate effect of these ailments. Streaty also argues that the ALJ failed to consider the combination of her exertional and nonexertional capacities, thus violating SSR 96-8p.

The Commissioner responds that the ALJ reasonably considered Streaty's combination of severe and non-severe impairments. The Commissioner argues that the ALJ adopted the opinion of Dr. Boyce, noted physical examination findings, and concluded no exertional limitations were present from Streaty's physical impairments.

Streaty's argument that the ALJ did not allow her to testify regarding her physical impairments, and failed to consider the combined effect of her ailments, is not persuasive. As noted earlier, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1). Dr. Boyce testified that he did not see any evidence of a physical impairment that lasted 12 months in time frame. R. at 864. Subsequently, Streaty's counsel agreed with the ALJ's statement that "there is no real evidence of a physical impairment." *Id*. When Streaty's counsel agreed there was no evidence of a physical impairment, the ALJ excused Dr. Boyce and moved on to testimony regarding Streaty's mental impairments. R. at 865. In his decision, the ALJ noted

further evidence of medical examination records reflecting no physical impairments.[6] *Id*. at 28. Furthermore, Streaty testified she could go back to work if it were not for her *mental* impairments. *Id*. at 890. The Court cannot conclude that the ALJ barred relevant testimony regarding Streaty's physical impairments when she testified she could successfully work with the impairments. The Court also finds that the ALJ adequately considered the combined effects of all Streaty's ailments. Consequently, these arguments are rejected.

Streaty's next argument involves the aggregate effect of her ailments. To buttress this argument, Streaty relies on *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). In *Green*, the Seventh Circuit ruled that the ALJ did not consider the aggregate effect of plaintiff's shortness of breath, chest pains and swollen leg. *Id*. However, *Green* is distinguishable from this case. In this case, the ALJ considered medical examinations along with the testimony of Dr. Boyce and Streaty (stating she could work with her then current physical condition) regarding her physical ailments. After weighing this evidence, the ALJ concluded the record did not show a physical impairment that would preclude her from performing basic work activities. R. at 28. The Court finds the ALJ adequately explained his assessment of the evidence regarding Streaty's physical impairments. Because the ALJ's "path of reasoning" is apparent, the Court finds no error.

Lastly, Streaty argues that the ALJ failed to combine her exertional and nonexertional capacities as the ALJ did in *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). But *Clifford* is also distinguishable. There, the ALJ failed to combine Clifford's weight problem with her other ailments. *Id*. The court noted there were "numerous references in the record to Clifford's excessive weight problem." *Id*. There were also several doctors who made diagnoses and

---

[6] The ALJ noted a medical examination in 2005 in which Streaty was able to get on and off the examination table with no difficulties; had normal gait and was able to stand on heels and toes; had full range of motion of all her extremities; her sensation was normal to light touch; was able to bend over without restriction and was able to squat normally; and was able to grasp, lift, carry and manipulate objects with both hands.

recommendations regarding Clifford's weight. *Id*. This is different from the case at hand. Streaty testified she had neuropathy, but "the [medication] [was] taking care of [it]." R. at 889. Once again, she also testified as to her ability to work with her physical problems. *Id*. at 890. Streaty claims the ALJ's failure to address this combination violates SSR 96-8p; however, the ALJ discussed her physical capacities and found no exertional limitations.

## IV. CONCLUSION

The ALJ omitted from his decision sufficient detail with respect to his conclusions regarding Streaty's lack of credibility. Accordingly, the Commissioner's decision is **REMANDED** for further proceedings consistent with this Entry.

IT IS SO ORDERED this day: 06/21/2011 .

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Charles D. Hankey
charleshankey@hankeylawoffice.com, kew@hankeylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, pearlie.wadlington@usdoj.gov, lin.montigney@usdoj.gov